UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| Louis P. Fromer, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:17-cv-00066-JMS-DLP |
| | ) | |
| Bobbi Riggs and Mary Chavez, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Plaintiff Louis Fromer alleges in this action that while he was incarcerated at the Wabash Valley Correctional Facility ("Wabash Valley"), Defendants Dr. Mary Chavez and Nurse Bobbi Riggs were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment to the United States Constitution when they ignored his repeated complaints of pain. Specifically, Mr. Fromer's claims center on his complaints of pain in his back, knee, and hand, and the denial of his repeated requests for medication to treat that pain. Defendants moved for summary judgment on Mr. Fromer's claims, [Filing No. 90], but Dr. Chavez subsequently withdrew her motion, [Filing No. 163]. Nurse Riggs' Motion for Summary Judgment remains pending and, additionally, Mr. Fromer has filed a Motion to Exclude the Medical Defendants['] Expert Report, [Filing No. 93], and a Motion for Confirmation, [Filing No. 140]. Mr. Fromer's motions and Nurse Riggs' Motion for Summary Judgment are now ripe for the Court's decision.

# I.
## MOTION FOR CONFIRMATION

The Court first considers Mr. Fromer's Motion for Confirmation. In his motion, Mr. Fromer requests that the Court confirm whether it received documents that he attempted to file through the librarian at the Indiana State Prison where he is currently incarcerated, including exhibits, a declaration, and his "opposition to sum. Judgment brief and facts in dispute." [Filing No. 140 at 1.] Mr. Fromer outlines issues he has had with filing documents while incarcerated, and requests that if the Court has not received the documents it give him permission to mail his documents to the Court rather than using the E-filing system. [Filing No. 140 at 1.]

The Court **GRANTS** Mr. Fromer's Motion for Confirmation to the extent that it confirms that it has received the following documents related to Nurse Riggs' Motion for Summary Judgment: (1) Mr. Fromer's Submission of Exhibits, filed on January 22, 2019, [Filing No. 139]; (2) Mr. Fromer's Memorandum Brief in Opposition to Defendant Dr. Mary Ann Chavez and Barbara Riggs RN, Motion for Summary Judgment, filed on February 27, 2019, [Filing No. 150]; (3) the Declaration of Louis P. Fromer, filed on February 27, 2019, [Filing No. 151]; (4) the Evidence Declaration of Louis P. Fromer, filed on February 27, 2019, [Filing No. 152]; and (5) Mr. Fromer's Statement of Material Facts in Dispute, filed on February 27, 2019, [Filing No. 153].[1]

The Court notes, however, that Mr. Fromer referred to multiple documents in his response brief that he did not file with the Court. On March 15, 2019, the Magistrate Judge held a telephonic status conference with the parties and ordered Mr. Fromer to produce the missing documents by

---

[1] Mr. Fromer filed a second "Statement of Material Facts in Dispute," [Filing No. 154], but it appears to be substantively duplicative of the first Statement of Material Facts in Dispute, just with slightly different pagination. [*See* Filing No. 153; Filing No. 154.]

March 22, 2019.  [Filing No. 162.]  Mr. Fromer has not filed the documents to date, so the Court

will not consider statements that are only supported by those documents.  [*See* Filing No. 162 at 2

(setting forth the documents to which Mr. Fromer refers, but which he has failed to submit to the

Court for its consideration).]

## II.
### MOTION TO EXCLUDE THE MEDICAL DEFENDANTS' EXPERT REPORT

Next, the Court will consider Mr. Fromer's Motion to Exclude the Medical Defendants[']

Expert Report.  [Filing No. 93.]

Defendants rely upon an expert report from Defendant Mary Ann Chavez, who is an

osteopathic physician and who provided much of the medical treatment to Mr. Fromer that is the

subject of this lawsuit.  Dr. Chavez concludes in her Expert Report as follows:

> The medical care and treatment Louis Fromer received for his hand, back, and knee
> complaints met or exceeded the standard of care appropriate under the
> circumstances.  X-rays of Mr. Fromer's lumbar spine have only shown very mild
> degenerative changes.  X-rays of his right knee in December 2015 were normal.  X-
> rays of Mr. Fromer's right hand showed: (1) no acute osseious abnormality or
> significant degenerative change; and (2) internal fixation of the 2nd digit
> metacarpal without complicating features.  Mr. Fromer was ultimately sent to a
> surgeon to remove hardware in his hand that was placed during a prior surgery.
>
> With normal x-rays, there was no indication for Mr. Fromer to be receiving narcotic
> pain relievers such as Percocet or Methadone.  Mr. Fromer was provided knee
> sleeves, a wrist brace, and appropriate pain medications.  In my opinion, Mr.
> Fromer was drug-seeking, as his subjective complaints of pain did not match the
> objective evidence.

[Filing No. 100-1 at 1.]  Dr. Chavez sets forth her opinions more fully in her Declaration filed with

Defendants' Motion for Summary Judgment.  [Filing No. 90-3.]

In his Motion to Exclude, Mr. Fromer argues that "Dr. Chavez is the defendant in this

action which automatically creates a bias and prejudice towards the plaintiff"; that because he did

not have an MRI on his back and knee, "it cannot be said with any certainty expert or not as to

what damage exists or does not exist regarding the knee and back issues"; and that Dr. Chavez does not indicate the nature of her medical expertise and "is not qualified as to having the same or close to the same knowledge and education as that of an orthopedic surgeon or specialist." [Filing No. 93 at 1-2.] Mr. Fromer relies upon *Rowe v. Gibson*, 798 F.3d 622 (7th Cir. 2015), for the proposition that the Seventh Circuit Court of Appeals has recognized "the harm in relying on an expert who in fact is also the defendant in the matter…." [Filing No. 93 at 2.]

Defendants argue in response that there is not a *per se* rule prohibiting a defendant from providing expert testimony. [Filing No. 100 at 4.] They distinguish *Rowe*, and argue that Mr. Fromer has not pointed to any opinion in Dr. Chavez's expert report that is implausible. [Filing No. 100 at 5.] Defendants also contend that Dr. Chavez's opinions are supported by the radiology reports and other medical records, and that Dr. Chavez need not be an orthopedic specialist "because she is not testifying regarding the standard of care for orthopedic specialists." [Filing No. 100 at 6.]

In his reply, Mr. Fromer takes issue with Dr. Chavez relying on x-ray reports rather than on the actual x-ray films, arguing that the x-ray reports "are nothing more than a 1 paragraph, non-detailed synopsis of an average x-ray." [Filing No. 103 at 2.] He sets forth additional perceived shortcomings in Dr. Chavez's expert report, and contends that "along with the bias and swayed opinions and feelings toward the Plaintiff, it is best that she is not allowed to preside as an expert witness in these proceedings." [Filing No. 103 at 2-3.]

Federal Rule of Evidence 104 instructs that "[t]he court must decide any preliminary question about whether a witness is qualified…or evidence is admissible." Fed. R. Evid. 104(a). Federal Rule of Evidence 702 provides that expert testimony is admissible if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the

evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. A trial judge "must determine at the outset…whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue…. Many factors will bear on the inquiry…." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-92 (1993).

The Court has a "gatekeeping obligation" under Rule 702, and "must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)). Put another way, the district court must evaluate: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Gopalratnam*, 877 F.3d at 779.

The Seventh Circuit in *Rowe* criticized the use of a defendant as an expert witness, stating:

> [T]he judge erred…by relying on a defendant...as the expert witness. There are expert witnesses offered by parties and neutral (court-appointed) expert witnesses, but defendants serving as expert witnesses? – and in cases in which the plaintiff doesn't have an expert witness because he doesn't know how to find such a witness and anyway couldn't afford to pay the witness? And how could an unrepresented prisoner be expected to challenge the affidavit of a hostile medical doctor (in this case really hostile since he's a defendant in the plaintiff's suit) effectively? Is this adversary procedure?

*Rowe*, 798 F.3d at 630.

Dr. Chavez's Expert Report deals primarily with her own care of Mr. Fromer, which is no longer an issue at this juncture since Dr. Chavez has withdrawn her Motion for Summary Judgment. [Filing No. 163.] While Dr. Chavez also discusses Nurse Riggs' treatment of Mr. Fromer, the Court need not rely, and has not relied, on Dr. Chavez's expert opinion regarding that care in considering Nurse Riggs' Motion for Summary Judgment as discussed below. Accordingly, the Court **DENIES** Mr. Fromer's Motion to Exclude at this time, but without prejudice to Mr. Fromer re-filing an appropriate motion in advance of trial.

### III.
### MOTION FOR SUMMARY JUDGMENT

Finally, the Court considers Nurse Riggs' Motion for Summary Judgment.

### A. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Cv. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

**B. Statement of Facts**

The following factual background is set forth pursuant to the standards detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

*1. Mr. Fromer's Medical Care Prior to Incarceration at Wabash Valley*

On February 28, 2011, Mr. Fromer saw Dr. Richard Jackson at Greenwood Orthopedics for complaints of right hand pain for ten years. [Filing No. 90-4 at 1-3.] Mr. Fromer reported that he was involved in a fight in 2000 and used that hand to punch, which caused pain and fractures. [Filing No. 90-4 at 1.] He also reported a prior right index finger surgery with pin fixation in March 2000. [Filing No. 90-4 at 1.] Dr. Jackson assessed a fracture malunion and pain due to inflammation and misalignment. [Filing No. 90-4 at 2-3.] His treatment plan included home exercises and they discussed surgery. [Filing No. 90-4 at 2.] Mr. Fromer understood that his pain may not subside after surgery, but he wished to proceed. [Filing No. 90-4 at 2-3.]

On March 30, 2011, Mr. Fromer underwent a right osteotomy[2] with repositioning of the second right metacarpal. [Filing No. 90-4 at 4-5.] He saw Dr. Jackson on April 13, 2011 for a follow-up.[3] [Filing No. 90-4 at 4-5.] X-rays showed the hardware was well-aligned and Dr. Jackson prescribed Tramadol as needed for pain. [Filing No. 90-4 at 5.] Mr. Fromer had additional

---

[2] Osteotomy is any surgery that cuts and reshapes bones. www.webmd.com.

[3] The records from Mr. Fromer's April 13, 2011 follow-up indicate that Mr. Fromer was incarcerated at that time. [*See* Filing No. 90-4 at 4 ("Patient is accompanied by a deputy today and explains that because of his inmate status he only receives the very minimal for pain management").] Neither Mr. Fromer nor Defendants contend that he was incarcerated at Wabash Valley at that time, though.

follow-ups and continued to complain of pain. [*See* Filing No. 90-4 at 6-9 (reflecting May 12, 2011 and June 3, 2011 follow-up visits).] On July 7, 2011, Dr. Jackson recommended surgery to remove the previously inserted plate and to possibly insert a bone graft. [Filing No. 90-4 at 10-11.]

On July 14, 2011, Mr. Fromer underwent surgery to remove the plate and insert a bone graft. [Filing No. 90-4 at 12.] X-rays after the surgery showed good alignment of the bone. [Filing No. 90-4 at 13.] At an August 22, 2011 follow-up appointment, Mr. Fromer advised that he still had discomfort, but that it had improved greatly. [Filing No. 90-4 at 14.] Mr. Fromer again complained of pain at a September 23, 2011 follow-up appointment, and at a January 13, 2012 appointment Dr. Jackson explained that the plate may need to be removed in the future, but he did not recommend removal at that time. [Filing No. 90-4 at 16-20.] At the January 13, 2012 appointment, Mr. Fromer also complained of right knee pain, although x-rays obtained that day were normal. [Filing No. 90-4 at 18-20.] Upon examination Mr. Fromer had full range of motion with patellofemoral crepitation.[4] Dr. Jackson recommended an exercise program focusing on quad strengthening and an MRI to rule out a torn meniscus. [Filing No. 90-4 at 20.] There is nothing in Mr. Fromer's medical records that reflects that Dr. Jackson recommended a total knee replacement. [Filing No. 90-4.]

### 2. *Mr. Fromer's Medical Care at Wabash Valley*

Mr. Fromer first arrived at Wabash Valley in 2013, was then housed at the Jerome Combs Detention Center, and then returned to Wabash Valley in December 2015. [Filing No. 90-4 at 21; Filing No. 151 at 1-2.][5] On December 22, 2015, Mr. Fromer had x-rays of the lumbar spine, which

---

[4] Patellofemoral crepitation is popping in the knee. www.healthline.com/health/osteoarthritis/crepitus.

[5] Dr. Chavez states in her Declaration that "'[i]t is not clear from the records when Mr. Fromer became incarcerated, but the record states that he returned to [Wabash Valley] on December 3,

showed mild L1-L2 disc degeneration. [Filing No. 90-4 at 24.] On December 28, 2015, x-rays of his right knee were taken due to Mr. Fromer complaining of worsening pain and difficulty ambulating. [Filing No. 90-4 at 25.] The x-rays indicated "no acute fracture of dislocation. Joint spaces are normal. No effusion. Soft tissues are unremarkable." [Filing No. 90-4 at 25.]

On January 17, 2016, Mr. Fromer received an open patella knee brace. [Filing No. 90-4 at 26.] He completed Request for Healthcare ("RFHC") 229159 on January 22, 2016, in which he stated:

> I was told after they took my x-rays that I would be given pain medication and be put on the computer for a bottom bunk. I received a knee brace and was told my back x-rays were degenerative. I am on a bottom bunk as of yesterday but don't want to get kicked off. My knee hurts very bad and was getting worse jumping up top.

[Filing No. 90-4 at 27.]

On February 4, 2016, Mr. Fromer saw Nurse Riggs in response to RFHC 229159. [Filing No, 90-4 at 28.] Nurse Riggs reviewed the knee x-rays with Mr. Fromer and informed him that they were normal. [Filing No. 90-4 at 28.] Mr. Fromer stated he was told prior to incarceration that he needed a total knee replacement and that he needed something for pain because he had been taking Lortab, Percocet, and Methadone prior to incarceration. [Filing No, 90-4 at 28.] Nurse Riggs informed Mr. Fromer that because the x-ray results of his knee were normal, the doctor

---

2015 after being away for two years for court." [Filing No. 90-3 at 5.] Mr. Fromer states that in November 2013 he requested "previous surgery records," but the request "either was not sent or it was not replied too (sic), considering there were no records obtained until I requested them on 2/10/16 and again on 2/21/16." [Filing No. 151 at 1.] Dr. Chavez does not discuss any records from Mr. Fromer's time at Wabash Valley from before 2015. [See Filing No. 90-3.] It is not clear whether Mr. Fromer's claims relate to his time at Wabash Valley beginning in 2015, or whether they also focus on treatment he received beginning in 2013. Nevertheless, neither side provides medical records reflecting treatment at Wabash Valley pre-2015, or discusses treatment during that time period, so it appears that Mr. Fromer's claims are limited to treatment received in 2015 and beyond.

would not be prescribing Lortab, Percocet, or Methadone. [Filing No. 90-4 at 28.] According to Nurse Riggs, medications such as Lortab, Percocet, and Methadone are generally not prescribed in prison unless absolutely necessary because of their high risk of diversion and abuse. [Filing No. 90-5 at 2.] Additionally, as a Registered Nurse, Nurse Riggs cannot prescribe medications, form diagnoses, or formulate treatment plans. [Filing No. 90-5 at 3.]

Robert Holleman, an inmate who lived with Mr. Fromer for approximately a year, states that Mr. Fromer requested that Corizon obtain his outside medical records on February 10, 2016, that Mr. Fromer did not receive Tylenol in February 2016, and that Mr. Holleman had to assist Mr. Fromer in writing the requests because of the pain in his hand. [Filing No. 139.]

On February 17, 2016, Mr. Fromer submitted RFHC 223928, in which he stated "I need [Wabash Valley] to obtain my records about my knee from Dr. Richard Jackson at Greenwood orthopedics at Community hospital south. He told me it needed replacement. But I was to (sic) young. I was on Pain Management for my back, Hand (Jackson did surgery) and my knee. [Wabash Valley] says x-rays normal on knee but haven't addressed my pain issues for all. Back, knee and hand hurt all the time. Commissary pain rel[ie]ver doesn't help!" [Filing No. 90-4 at 30.] Nurse R. Robinson wrote a response on RFHC 223928 stating "12/18/15 you were seen on MD sick call. MD noted you had range of motion to knee, @ times painful. X rays ordered. Tylenol prescribed." [Filing No. 90-4 at 30.]

Mr. Fromer submitted RFHC 223980 four days later, on February 21, 2016, stating "I never received any Tylenol. X-rays taken by you say nothing is wrong with my knee. I've been told different by World Renowned Surgeon Richard Jackson of Greenwood Ortho. in indpls IN at Community Hospital South. I would like my records from his office. MY KNEE HURTS!"

[Filing No. 90-4 at 31.] In the response section of the form, staff wrote "Requesting records." [Filing No. 90-4 at 31.]

On March 8, 2016, Mr. Fromer submitted RFHC 223988, in which he stated: "My knee is still hurting very badly and the knee brace you gave me is to (sic) big. It is a medium but I need a small. It slips down my leg. I have been up with no sleep all night because of my knee!" [Filing No. 90-4 at 34.] Staff wrote in the response section of the form "Re-order size small." [Filing No. 90-4 at 34.] On March 20, 2016, he submitted RFHC 230987, in which he stated "I still don't have my knee brace and still nothing being done about my chronic pain. My records have been sent in! This is cruel and unusual punishment." [Filing No. 90-4 at 37.] Staff wrote in the response section of the form "Knee brace issued." [Filing No. 90-4 at 37; *see also* Filing No. 90-4 at 38 (Corizon Property Receipt for knee brace, signed by Mr. Fromer on March 22, 2016); Filing No. 90-4 at 39-40 (Nurse Riggs' notes from March 22, 2016 visit stating that a knee sleeve was issued that day).]

On April 16, 2016, Mr. Fromer saw Dr. Samuel Byrd for a Chronic Care Visit at which he complained of knee pain, low back pain, and other issues. [Filing No. 90-4 at 41.] Dr. Byrd noted that Mr. Fromer reported a need for a total knee replacement, but that his x-rays were "essentially negative" and that Dr. Jackson had previously recommended doing quad strengthening exercises. [Filing No. 90-4 at 41.] Dr. Byrd also noted that Mr. Fromer had a small knee sleeve, but reported that it did not fit. [Filing No. 90-4 at 41.] Mr. Fromer also reported lower back pain due to degenerative changes, and Dr. Byrd noted that x-rays showed degenerative changes at L1-L2. [Filing No. 90-4 at 41.] Mr. Fromer also stated that he had previously been on Methadone and Norco with a pain management specialist and was previously on Tramadol as well [Filing No. 90-4 at 41.] He reported that his low back pain was most severe when trying to sleep

at night and when first getting up in the morning, though he denied any significant daytime pain. [Filing No. 90-4 at 41.] Mr. Fromer denied improvement with Tylenol, Ibuprofen, and Mobic prescribed in the past. [Filing No. 90-4 at 41.] Dr. Byrd noted that the high dose of Prozac Mr. Fromer was taking made Tramadol contraindicated due to Serotonin Syndrome.[6] Dr. Byrd prescribed Tegretol for lower back pain. [Filing No. 90-4 at 44.] On April 25, 2016, Mr. Fromer received an extra-small knee brace. [Filing No. 90-4 at 48.]

On May 9, 2016, Mr. Fromer submitted RFHC 234681 in which he requested a small "McKesson" knee sleeve, which was subsequently ordered for him. [Filing No. 90-4 at 49.] On May 18, 2016, he submitted RFHC 237582, stating: "The tegretal (sic) I have been prescribed is not helping my pain at all. It did for a short time for my knee but now it seems my pain issues are just as bad if not worse. It is also giving me headaches, making me not think right, I'm rubbing my thumb and middle fingers together, I seem confused, I think it is messing with my depression meds…." [Filing No. 90-4 at 50.] Mr. Fromer received a small knee brace that day. [Filing No. 90-4 at 51.]

On May 20, 2016, Nurse Riggs saw Mr. Fromer in response to RFHC 237582. [Filing No. 90-4 at 52-53.] Mr. Fromer informed Nurse Riggs that Tegretol was not helping his pain and that he was experiencing the side effects he outlined in his RFHC. [Filing No. 90-4 at 52.] Nurse Riggs noted:

> Offender thanked this nurse for the new knee sleeves. States that his knees feel much better with the new sleeve. No signs of pain. No grimacing. Walks without difficulty. No squinting of eyes. No pill rolling noted with hands. Offender would start a sentence and then say, "see look, I can't think right." No confusion noted. Seemed to be a/ox3. Explained that these side effects should lessen as he takes the

---

[6] Serotonin Syndrome is where too much serotonin is produced which can "lead to excessive nerve cell activity, causing a potentially deadly collection of symptoms." https://www.webmd.com/default.htm. Serotonin Syndrome "often begins within hours of taking a new medication that affects serotonin levels…." *Id.*

medicine longer.  He states that this is what his therapist told him as well.

[Filing No. 90-4 at 53.]

Dr. Chavez saw Mr. Fromer for the first time on June 9, 2016, for a Chronic Care Visit.
[Filing No. 90-4 at 54-57.]  During the visit, Mr. Fromer complained of headaches that started after
he was prescribed Tegretol and reported trying Ibuprofen and Aleve for relief.  [Filing No. 90-4 at
54.]  He also complained of chronic pain in his right hand following surgery, right knee pain due
to osteoarthritis and chondromalacia of the patella that he stated might cause him to need a total
knee replacement in the future, and chronic back pain due to degenerative changes at L1-L2.
[Filing No. 90-4 at 54.]  On examination, Mr. Fromer had decreased range of motion in his lumbar
spine and decreased grip in the right hand.  [Filing No. 90-4 at 56.]  Dr. Chavez discontinued
Tegretol to alleviate Mr. Fromer's headaches, prescribed Tylenol and Naproxen, and noted that
the effect of the two together was expected to relieve Mr. Fromer's pain, "including chronic hand
pain, chronic back pain, and chronic knee pain."  [Filing No. 90-4 at 56.]

On June 23, 2016, Mr. Fromer submitted RFHC 239272, stating "I have been taken off
tegretol and thought I was getting different medication?  I still have NOTHING!  I have severe
pain!  What is going ON?  Why are my issues being ignored/neglected?  This is not humane
treatment!" [Filing No. 90-4 at 58.]  The Medication Administration Record for June 2016 shows
that Dr. Chavez ordered Naprosyn and Tylenol on June 9, 2016, and that Tegretol was discontinued
on June 11, 2016.  [Filing No. 90-4 at 59.]  Although Plaintiff alleges that he saw Dr. Chavez on
June 29, 2016 and told her he had not received the Tylenol and Naproxen,[7] she does not recall
seeing him on that date and she could not find any medical records showing that she saw him on
that date. [Filing No. 90-3 at 8.]  Dr. Chavez does not know why Mr. Fromer was not receiving

---

[7] Naproxen and Naprosyn are the same thing. https://www.drugs.com/.

the medications she ordered on June 9, 2016. [Filing No. 90-3 at 8.] She was unable to locate her original medication request form from June 9, 2016 in Mr. Fromer's medical records. [Filing No. 90-3 at 8.] Mr. Holleman, Mr. Fromer's fellow inmate, states in his Declaration that "[b]eginning in June 2016, Fromer was left without pain medications for over a month or a month and a half based on the Defendant's conduct." [Filing No. 139 at 7.]

On July 11, July 16, and July 19, 2016, Mr. Fromer submitted RFHC 239331, RFHC 239353, and RFHC 239425, in which he stated that he was in pain and his Tegretol was stopped, but he had not received a different pain medication, and that his pain was caused by "several surgeries due to an old injury." [Filing No. 90-4 at 60-61; Filing No. 139 at 19.] When Nurse Riggs received the RFHCs, she investigated his complaints by reviewing the medical records to find out if he had a valid prescription for other medications. [Filing No. 90-5 at 4.] She saw that Dr. Chavez had ordered Naproxen and Tylenol on June 9, 2016, but did not find any record showing whether the orders had been approved or denied. [Filing No. 90-5 at 4.] Nurse Riggs notified Dr. Chavez, and she resubmitted her orders for Tylenol and Naproxen on July 21, 2016. [Filing No. 90-5 at 4.] Nurse Riggs responded to the RFHCs that Tylenol and Naprosyn were submitted for approval. [Filing No. 90-5 at 4.] Even medications such as Naproxen and Tylenol need approval, and Dr. Chavez submitted requests for approval of those medications. [Filing No. 90-3 at 9.] Mr. Fromer received 180 tablets of Tylenol and 60 tablets of Naproxen on July 25, 2016. [Filing No. 90-3 at 9; Filing No. 90-4 at 65-66.]

On July 22, 2016, Mr. Fromer filed a Request for Interview in which he stated "My informal I sent to Corizon on the morning of 7-8-16 has been ignored/not answered. Corizon is ignoring all of my Health care request about my pain issues and not giving me medicine I was told

by the doctor I was supposed to get almost 2 months ago!" [Filing No. 139 at 46.] In the "Action" section, medical staff wrote "Nuproxin? Just # approved 7/21 – Tylenol?" [Filing No. 139 at 46.]

On August 2, 2016, Mr. Fromer submitted an Offender Complaint in which he stated that he had reported side effects of Tegretol, that the doctor had ordered another medication, and that he had not received the other medication. [Filing No. 139 at 40.] Medical staff noted on the Offender Complaint "Naprosyn & Tylenol were ordered and approved on 7/21/16. Saw MD on 6/29/16. You received 60 Naprosyn & 180 Tylenol on 7-25-16… We apologize for the delay & are working on correcting medication issues." [Filing No. 139 at 40.]

On August 3, 2016, Mr. Fromer filed an Offender Grievance in which he complained regarding his RFHCs being ignored, and the delay in getting his pain medication. [Filing No. 139 at 41.] In the "response" section, medical staff noted "we are working [on] correcting any issues with medications arriving in a timely manner." [Filing No. 139 at 42.] The Grievance was ultimately denied because Mr. Fromer had received his medication. [Filing No. 139 at 43.] Mr. Fromer received another 180 tablets of Tylenol and 60 tablets of Naproxen on August 22, 2016. [Filing No. 90-4 at 67.]

On September 2, 2016, Mr. Fromer had a Nurse Visit with Nurse Regina Robinson. [Filing No. 90-4 at 68-69.] He complained of right hand pain, and Nurse Robinson noted "[t]his is the second time seen by medical in 3 days."[8] [Filing No. 90-4 at 68.] Nurse Robinson assessed Mr. Fromer's pain as being related to a "strain/sprain," and recommended "ice/cool compresses." [Filing No. 90-4 at 69.]

Mr. Fromer submitted RFHC 239574 on September 21, 2016, stating "I was supposed to be scheduled to see the Dr. after going to sick call. It's been almost 3 weeks and I still have not

_____

[8] Records from the other visit are not included in the parties' submissions.

seen the Dr.  My pain is terrible and the medication is still hurting my stomache (sic).  When will I see the doctor?"  [Filing No. 90-4 at 71.]  Dr. Chavez saw Mr. Fromer that same day for a Chronic Care Visit.  [Filing No. 90-4 at 72-76.]  He reported constant pain in his right hand stemming from a fracture in 2000. [Filing No. 90-4 at 72.]  He stated he had multiple surgeries on his hand, including reconstruction of bones with placement of a titanium plate in the second metacarpal.  [Filing No. 90-4 at 72.]  He also stated that Dr. Jackson had performed surgery twice in 2010 and 2011 and that he had been prescribed Methadone and Lortab to control pain in addition to Neurontin.  [Filing No. 90-4 at 72.]  Mr. Fromer stated he could not tolerate Naproxen because it hurts his stomach.  [Filing No. 90-4 at 72.]  Mr. Fromer also stated that he "failed Tegretol because of headaches, nausea, and feeling drunk."  [Filing No. 90-4 at 72.]  Dr. Chavez advised him that nonsteroidal anti-inflammatory drugs ("NSAIDs") were contraindicated due to his Hepatitis C infection.  [Filing No. 90-4 at 72.]  She performed a thorough examination of his hand and noted the presence of carpal tunnel syndrome.  [Filing No. 90-3 at 10; Filing No. 90-4 at 72.]  Mr. Fromer also had a decreased grip with his right hand.  [Filing No. 90-4 at 72.]  Dr. Chavez's treatment plan consisted of continuing Tylenol, discontinuing Naproxen due to it causing an upset stomach and because of Mr. Fromer's Hepatitis C infection, and requesting Neurontin because it is effective in the treatment of neuropathic pain syndrome.  [Filing No. 90-3 at 10; Filing No. 90-4 at 72.]

Once again, Dr. Chavez was unable to locate her original medication request from September 21, 2016 for Tylenol and Neurontin.  [Filing No. 90-3 at 10.]  Dr. Chavez has no knowledge regarding what happened to her request after she submitted it.  [Filing No. 90-3 at 10.]  Mr. Fromer's fellow inmate, Mr. Holleman, states in his Declaration that Mr. Fromer had to wait twenty days for his pain medication in September 2016.  [Filing No. 139 at 7.]  On October 6, 2016, Dr. Chavez requested Prilosec, Naprosyn, and Tylenol for Mr. Fromer.  [Filing No. 90-4 at

79.]  At that time, she did not know if her previous request for Neurontin had been approved by the Regional Medical Director.  [Filing No. 90-3 at 10.]  She prescribed Prilosec to control the production of hydrochloric acid in the stomach – a side effect of NSAIDs like Naprosyn – that results in gastrointestinal discomfort and pain.  [Filing No. 90-3 at 10.]  On October 18, 2016, she again submitted her request for Neurontin for Mr. Fromer.  [Filing No. 90-4 at 81.]

Mr. Fromer alleges that he saw Dr. Chavez on October 18, 2016, and she refused to look at his pre-incarceration medical records and x-rays, but Dr. Chavez does not recall seeing him that day and did not locate any medical records reflecting an encounter on October 18, 2016.  [Filing No. 90-3 at 10.]  Nonetheless, Dr. Chavez had previously reviewed Mr. Fromer's pre-incarceration medical records and x-rays and was familiar with his prior treatment and surgeries by Dr. Jackson.  [Filing No. 90-3 at 10.]

Mr. Fromer produced medical records from his October 18, 2016 visit, which indicate that he did see Dr. Chavez that day and she noted that he was complaining of right hand pain and right knee pain.  [Filing No. 139 at 27.]  Dr. Chavez noted that Mr. Fromer was walking normally without a limp, was carrying a stack of reading material using his right hand, and that her "[o]bservation of patient's body mechanics is not consistent with his complaint of pain and his request for pain medications."  [Filing No. 139 at 27.]

Dr. Chavez saw Mr. Fromer on October 28, 2016, and he recounted the entire history of his injury and surgeries with his hand and requested additional x-rays.  [Filing No. 90-4 at 83.]  Dr. Chavez noted that he was able to use his hand and grasp and was able to do activities of daily living, but was experiencing worsening discomfort by the end of the day.  [Filing No. 90-4 at 83.]  Dr. Chavez ordered x-rays and the radiology report stated "there is internal fixation of a healed anatomically aligned 2nd digit metacarpal fracture without complicating features.  The remainder

18

of the bones in joint spaces appear intact. There is no acute fracture or dislocation. No erosions. Soft tissues are unremarkable." [Filing No. 90-4 at 85.] The radiologist concluded that there was no acute osseous abnormality or significant degenerative change, and that there was an internal fixation of the second digit metacarpal without complicating features. [Filing No. 90-4 at 85.] The radiology report indicated to Dr. Chavez that Mr. Fromer's hand had healed properly, that everything was properly aligned, and that there were no abnormalities that could be the cause of his reported pain symptoms. [Filing No. 90-3 at 11.]

On October 31, 2016, Mr. Fromer submitted RFHC 257847 in which he stated that he had been trying to get adequate pain medication for almost two months. [Filing No. 90-4 at 86 ("It has been almost 2 months that I have been trying to get adequate Pain medication. I've seen the Dr. twice now and she tells me she is having something perscribed (sic) like Neuro[n]tin. I never get it. My tylenol was stopped as well. Please Explain. This is getting very Frustrating!").] A nurse responded that Mr. Fromer was receiving Neurontin with his medications at the "med window." [Filing No. 90-4 at 86.] The October 2016 Medication Administration Record reflects an "order date" and "stop date" of "10-21-16" for Neurontin, [Filing No. 90-4 at 88], although Dr. Chavez states in her Declaration that she ordered the Neurontin on September 21, 2016, [Filing No. 90-3 at 11].

On November 12, 2016, Mr. Fromer submitted RFHC 245704, in which he stated "My hand is in severe pain as well as my back and knee. The very small amount of Pain medicine I have been given doesn't do anything at ALL to even somewhat Dull the pain. It's been almost a year that I've been complaining and I am not being taken seriously! I NEED something DONE! Hand may be re-broken." [Filing No. 90-4 at 89.] On November 15, 2016, Mr. Fromer saw Nurse Riggs due to complaints of severe pain in his hand, back, and knee. [Filing No. 90-4 at 90.] Mr.

Fromer reported his pain was "10/10", but walked into the infirmary without difficulty and looked to be in no pain. [Filing No. 90-4 at 91.] Upon examination, Nurse Riggs noted Mr. Fromer's hand was tender and had pain with movement. [Filing No. 90-4 at 91.] Mr. Fromer stated that his hand was swollen, but Nurse Riggs did not observe any swelling. [Filing No, 90-4 at 91.] Mr. Fromer stated that he was on a much higher dose of Neurontin prior to incarceration and that his current dose was insufficient. [Filing No. 909-4 at 91.] Nurse Riggs referred him to the doctor for pain management. [Filing No. 90-4 at 81.] In November 2016, Mr. Fromer was prescribed Tylenol, Neurontin, and Naprosyn for pain. [Filing No. 90-4 at 93.]

On December 13, 2016, Mr. Fromer was scheduled to see the doctor for a Chronic Care Visit, but stated he did not want to wait in line due to having access to the law library during his appointment time. [Filing No. 90-4 at 95.] On December 15, 2016, Mr. Fromer had a Nurse Visit with Nurse Riggs because he submitted a RFHC regarding a wrist brace. [Filing No. 90-4 at 97.] Mr. Fromer complained "I was told by medical I could not get a brace for my hand/wrist. However, yesterday I saw an inmate in my class get the same brace I am supposed to have." [Filing No. 90-4 at 97.] Nurse Riggs summarized the visit as follows:

> Offender was scheduled for NSC for issue regarding not getting a wrist brace. Was asking him questions about his hand and his injury. Offender was argumentative stating you have my medical record in front of you, you just need to read it. Explained that I was going to ask him questions and he needed to answer them. Asked offender again about his…injury and he again was argumentative. Offender was asked to leave. Offender said that he would leave, but he was going to sue me.

[Filing No. 90-4 at 97.] Mr. Fromer states that he had waited two and one-half hours to be seen by Nurse Riggs, and that she let several people who arrived after him be seen first. [Filing No. 151 at 9-10.]

Dr. Chavez saw Mr. Fromer on December 26, 2016, and he complained of low back pain due to degenerative change and knee pain. [Filing No. 90-4 at 98.] Dr. Chavez ordered refills for Mr. Fromer's Naprosyn and Tylenol. [Filing No. 90-4 at 98.]

On January 5, 2017, Dr. Chavez saw Mr. Fromer for his complaint of right hand pain. [Filing No. 90-4 at 102.] Dr. Chavez noted that Mr. Fromer was already taking Naproxen, Tylenol, and Neurontin, and that Mr. Fromer was requesting a support for his right hand and she would request "prop-up wrist support to wear on right hand and wrist." [Filing No. 90-4 at 102.] Dr. Chavez noted:

> Offender is requesting increase in Neurontin. Offender mentioned that he had been prescribed large doses of Neurontin prior to being incarcerated stating that the dose was 1600 mg bid. Offender stated that he had been prescribed Mobic prior to being incarcerated. Offender stood up and pulled his right hand through his jumper sleeve and was fumbling around inside his jumper with his right hand. I strongly advised the offender to "get your hand out of there"; whereupon, he pulled out a piece of paper stating that it was a list that he wanted to talk about today. I reminded him that this visit was scheduled to discuss his right hand pain and we have done that and I have requested the propup wrist splint for him. Offender insulted this provider several times during this session. At end of session, offender was asked to leave. He continued to request more for relief of his pain. This provider requested that custody remove offender from Bay 2 because he was refusing to leave. Offender was observed lifting his winter coat using his right hand. He did this without difficulty and without indication of any pain. Body mechanics was not consistent with his complaint of pain. This offender is drug seeking. This offender stated that he will be filing a law suit against this provider. He stated this in the presence of the Custody Officer.

[Filing No. 90-4 at 103-04.]

On January 19, 2017, Mr. Fromer received a wrist splint. [Filing No. 90-4 at 107.] Mr. Fromer saw Nurse Kimberly Hobson on February 7, 2017 "to discuss his complaint of wanting an outside referral and med and different brace." [Filing No. 90-4 at 108.] Nurse Hobson stated that Mr. Fromer had been provided a wrist brace that was appropriate for his wrist and was taking Neurontin for his pain. [Filing No. 90-4 at 108.] Mr. Fromer stated that he did not wear the brace

at night, and Nurse Hobson explained that he has already had three surgeries, a fourth probably would not benefit him, and that he should alternate between hot and cold, wear his brace at night, and the pain medication should help. [Filing No. 90-4 at 108.] Nurse Hobson also told Mr. Fromer that an outside referral was not being requested at that time. [Filing No. 90-4 at 108.]

Dr. Chavez next saw Mr. Fromer on February 23, 2017, and he requested an orthopedic referral for his right hand. [Filing No. 90-4 at 110.] Regarding the pain in his right hand, he stated "[t]here are some times that I'm not aware of it; however it keeps me up in the night from time to time." [Filing No. 90-4 at 110.] Dr. Chavez noted that Mr. Fromer was taking three prescription medications for pain, that Mr. Fromer stated that he is unable to tie up his laundry bag and is having difficulty writing for long periods of time, that he wears his wrist support at bedtime, that he gets ice from the ice machine every other day and ices his wrist for about 20-30 minutes, and that he cannot have access to a microwave to heat a towel for a heat wrap so he often sits on his right hand when he is in his bunk for body heat. [Filing No. 90-4 at 110.] Dr. Chavez again reviewed the radiology report from the October 28, 2016 x-rays showing "internal fixation of a healed anatomically aligned second digit metacarpal fracture without complicating features." [Filing No. 90-4 at 113.] Dr. Chavez's assessment during the appointment was that Mr. Fromer was exhibiting drug seeking behavior, and she noted "Offender is prescribed Neurontin, Naprosyn, and Tylenol. Offender is requesting an increase in Neurontin; or addition of another medication to treat his pain. Offender complaint of pain does not match his body mechanics: rolling paper into tube and waving it around with his right hand; placing his right hand under his right buttock and sitting on it to transfer body heat into his right hand. At no time during his encounter did offender appear to be in pain." [Filing No. 90-4 at 113.] Dr. Chavez recommended that Mr. Fromer purchase muscle

rub from the commissary and apply it to his hand and he agreed. [Filing No. 90-4 at 113.] She

also ordered additional hand x-rays. [Filing No. 90-4 at 113.]

On February 28, 2017, x-rays were taken of Mr. Fromer's right hand and the radiology

report stated "images of right hand fail to demonstrate fracture or dislocation, postoperative

changes of…reduction internal fixation of second metacarpal fracture are present, with sideplate

and compression screws in place carpal elements are in anatomic alignment. Joint spaces appear

intact. No significant degenerative changes are seen." [Filing No. 90-4 at 115.] The report

concluded "1. No acute bony abnormality right hand. 2. Remote orif second metacarpal without

complication." [Filing No. 90-4 at 115.] This report, like the previous report, again indicated to

Dr. Chavez that Mr. Fromer's prior hand surgery had been successful, as the report showed no

abnormalities or other reason for his reports of pain. [Filing No. 90-3 at 15.] The report combined

with Mr. Fromer's past history of drug abuse and her observations of him not appearing to be in

any pain reinforced Dr. Chavez's opinion that he was drug seeking. [Filing No. 90-3 at 15.]

Dr. Chavez saw Mr. Fromer again on March 2, 2017. [Filing No. 90-4 at 118.] He

complained of knee pain that he attributed to a prior motor vehicle accident, and told Dr. Chavez

that Dr. Jackson recommended a total knee replacement. [Filing No. 90-4 at 118.] On

examination, both knees were normal and Mr. Fromer had normal gait and could walk heel to toe

without a limp. [Filing No. 90-4 at 118.] Mr. Fromer also complained of hand pain, and again

requested to see an orthopedist for an evaluation and treatment. [Filing No. 90-4 at 118.] He

stated the recent x-ray showed the plate and screws and he believed this was the source of his pain

and he was adamant about having his Neurontin increased or for something stronger to be

prescribed for him. [Filing No. 90-4 at 118.] Dr. Chavez instructed him to purchase

hydrocortisone cream or muscle rub from the commissary and apply a small amount to his right

hand and he agreed. [Filing No. 90-4 at 118.] On March 7, 2017, Dr. Chavez submitted a request for Mr. Fromer to see an orthopedist regarding his right hand. [Filing No. 90-4 at 123-24.] The request was approved the next day, March 8, 2017. [Filing No. 90-4 at 127.]

Dr. Chavez next saw Mr. Fromer on March 23, 2017. [Filing No 90-4 at 128.] Although he complained of knee pain, Dr. Chavez observed Mr. Fromer walking rapidly into the examination area without difficulty and without a limp. [Filing No. 90-4 at 128.] His current pain medications included Neurontin, Tylenol, and Naproxen. [Filing No. 90-4 at 128.] Mr. Fromer reported he had stopped taking Naproxen after he saw blood in the toilet and a nurse advised him to stop taking it. [Filing No. 90-4 at 128.] Dr. Chavez discontinued the prescription for Naproxen and increased Mr. Fromer's Neurontin prescription from 400 mg twice per day to 600 mg twice per day. [Filing No. 90-4 at 128.] Mr. Fromer stated he believed there was something wrong with his bones and joints and requested a bone marrow test. [Filing No. 90-4 at 128.]

On April 18, 2017, Mr. Fromer saw Dr. Doug McGuirk, an orthopedist at UAP Clinic Bone and Joint Center. [Filing No. 90-4 at 132.] Dr. McGuirk planned to schedule surgery to remove the hardware in Mr. Fromer's right index finger metacarpal and a bone spur (osteophyte). [Filing No. 90-4 at 132.] On April 27, 2017, Dr. Chavez saw Mr. Fromer to follow up after his visit with Dr. McGuirk. [Filing No. 90-4 at 134.] She noted Dr. McGuirk's finding that Mr. Fromer's pain in his right index finger was due to retained hardware with a bone spur, despite prior radiology reports not mentioning a bone spur and finding that the hardware was intact without complications. [Filing No. 90-3 at 16; Filing No. 90-4 at 135.] Dr. Chavez informed Mr. Fromer that she would request the surgery. [Filing No. 90-4 at 135.] Dr. Chavez noted "Offender is demanding more medication for treatment of pain in his right hand. He is already being prescribed Neurontin 600 mg 1 po bid, Venlafaxine 150 mg 2 po once daily, and Tylenol 325 mg 2 po tid. Offender was

showing aggressive behavior in his pursuit of having more medication for treatment of pain; and two Correction Officers came into Bay 2 to escort this offender out of OSB when they overheard this offender raising his voice to this provider and using the back of his right hand to smack it against his left hand while demanding that he be prescribed more pain medications." [Filing No. 90-4 at 135-36.] Dr. Chavez submitted the request for surgery on May 1, 2017. [Filing No. 90-4 at 137.]

On May 11, 2017, Mr. Fromer submitted RFHC 241080 in which he stated "Am I going to get my Tylenol like I was told or not?" [Filing No. 139 at 33.] Health care staff noted "sent for." [Filing No. 139 at 33.]

### 3. Observations of Other Inmates

Mr. Fromer submits affidavits from several Wabash Valley inmates regarding their observations of him and his pain level. Inmate Danny Bailey states that Mr. Fromer came to him many times with problems with his right hand. [Filing No. 139 at 4.] He states that Mr. Fromer "has asked me to pray over him about the pain in his hand. It has been brought to my attention several times and has been told to me that he couldn't clap during service because of it. He has told me that he has seen medical over and over again, and yet they still do nothing. In addition he has also brought it to my attention several times about pain in his knee as well." [Filing No. 139 at 4.]

Dolen Glenn states that Mr. Fromer was "in major pain from accident, the operation on his hand. They stopped Tegretol on him around 6-14-16. They didn't re-start pain medication until 7-25-16, w[h]ere he was in major pain from the operation. Fromer told me he still in pain even with the new pain medication of Tylenol and Naproxin." [Filing No. 139 at 5.]

Gregory Nurrenberg states "Last year when [Mr.] Fromer was in building maintenance class at Wabash Valley…, he complained of hand pain so severe, I had to help him by writing out his homework assignments for him. I've known Fromer for over two years and he's complained of severe back, knee, and hand pain since I first met him. He's constantly complaining that medical staff refuses to give him proper treatment for his pain." [Filing No. 139 at 9.]

James Walls states that "during the months of June 2016 to July 2016, I did hear Mr. L. Fromer complain of pain in his back, knees and hand. It was a period of time almost two full months in length, I can not recall exact dates. Mr. Fromer explained the pain he was in was because his prescribed medication was stopped. Sometime in late July early August he said that he was now being prescribed Tylenol & Naproxen. Mr. Fromer said this only edged the pain by a miniscule amount and he still complained that the pain kept him from getting any sleep or walk at a normal pace." [Filing No. 139 at 12.]

### 4. Mr. Fromer's Surgery

On July 7, 2017, Mr. Fromer saw Dr. Byrd. [Filing No. 90-4 at 140.] Dr. Byrd noted that Mr. Fromer reported a need for a total knee replacement based on a recommendation by an orthopedist in January 2012, but that Dr. Byrd saw no such recommendation in Mr. Fromer's medical records. [Filing No. 90-4 at 140.] Dr. Byrd noted that Dr. Jackson had recommended an MRI to rule out a meniscal tear, but x-rays since incarceration had remained unremarkable. [Filing No. 90-4 at 140.] Dr. Byrd noted that one would expect some degenerative arthritis on an x-ray if there was truly a meniscal tear in 2012, although that was not certain. [Filing No. 90-4 at 140.] Mr. Fromer agreed to a cortisone injection for his knee. [Filing No. 90-4 at 140.] Dr. Byrd also noted that he had seen Mr. Fromer ambulate with no difficulty to the cafeteria, the medication window, and medical offices when he was unaware Dr. Byrd was watching him. [Filing No. 90-

26

4 at 140.] This most recently occurred the day before the examination, and Dr. Byrd noted that Mr. Fromer had a "hysterical gait" the day of the examination as if there was an acute injury. [Filing No. 90-4 at 140.] Regarding the right wrist pain, Dr. Byrd noted that Mr. Fromer was scheduled for surgery to remove the hardware and a bone spur in his right index finger. [Filing No. 90-4 at 140.] He noted that Mr. Fromer had been treated with Neurontin 600 mg twice per day and muscle rub, and that Dr. Byrd had recently increased Neurontin to 900 mg twice per day and started lidocaine 5% ointment twice per day to apply to the right hand. [Filing No. 90-4 at 140.] Dr. Byrd planned to increase the Neurontin to 1200 mg twice per day. [Filing No. 90-4 at 140.] Dr. Byrd noted that Mr. Fromer asked about the availability of Lidocaine 7.5% ointment until his surgery, as he "know[s] it comes in this strength," and that Mr. Fromer had "found the strength in some sort of drug book he has in his cell." [Filing No. 90-4 at 141.]

Sebastian Purvis, a Wabash Valley inmate, states that on July 11, 2017 he was pushing another inmate in a wheelchair when Mr. Fromer "walked up from behind me. When he was beside me I noticed that he was limping badly. At that time he asked if he could grab a handle and lean against the wheelchair to the chow hall. I agreed and we slowly moved along the offender sidewalk all the way from the Offender Services Building to the chow hall with him grabbing onto a handle on the wheelchair and leaning against it. Once at the chow hall [Mr. Fromer] stopped to lean against the wall and talk to an officer." [Filing No. 139 at 10.]

On July 18, 2017, Mr. Fromer had x-rays on both of his knees. [Filing No. 90-4 at 144.] The radiologist concluded that there was no acute bony abnormality to the right knee, with mild single compartment degenerative change, and the left knee showed no acute bony abnormality or significant degenerative change. [Filing No. 90-4 at 144-45.]

On August 1, 2017, Mr. Fromer had a Chronic Care Visit with Dr. Byrd. [Filing No. 139 at 20.] As for Mr. Fromer's knee pain, Dr. Byrd noted:

> He denies acute injury but reports knee pain has occurred increasingly over time following [a motor vehicle accident] in which his patella had possibly dislocated. He denies joint erythema or warmth but does believe the knee(s) swell at times. No swelling today. He notes his pain markedly improved at time of cortisone injection in mid July, but within 2-3 hours of injection he notes his leg turned a violaceous color and he developed intense burning pain. He was apparently unable to walk for several days. He states today the knee hurts but it feels more lubricated. He has been researching this and believes he has chondromalacia patella, a synonym for patellofemoral pain syndrome. He would like a knee brace that fits, but unfortunately his leg is too small for even the smallest adult knee brace. I have discussed increasing quadriceps strength and mass to improve knee pain. Overall, no change. He seems to be ambulating w/o limitation.

[Filing No. 139 at 21.]

On August 16, 2017, Dr. McGuirk performed surgery on Mr. Fromer to remove the hardware and bone spur from his right index finger. [Filing No. 90-4 at 146-50.] Upon discharge, Mr. Fromer was prescribed Gabapentin, Norco, Vicodin, and Tylenol for pain. [Filing No. 90-4 at 148-49.] Mr. Fromer had a follow-up with Dr. McGuirk on August 28, 2017. [Filing No. 90-4 at 151-57.] Mr. Fromer was "doing well but does complain of pain in his hand and index finger with some occasional pain in this wrist. Also complains of some swelling and stiffness in his index finger." [Filing No. 90-4 at 154.] Mr. Fromer was shown post-surgery x-rays, which were normal, and was given Velcro "buddy straps" to help with his range of motion and to prevent trauma to his index finger. [Filing No. 90-4 at 157.] Mr. Fromer was also shown active and passive finger range of motion exercises to perform. [Filing No. 90-4 at 157.]

On September 25, 2017, Mr. Fromer saw LPN Darlene Taylor complaining of right hand and knee pain. [Filing No. 139 at 30.] Mr. Fromer was referred to a medical provider. [Filing No. 139 at 32.]

On November 7, 2017, Mr. Fromer had his final follow up with Dr. McGuirk, who noted he was doing very well and only had occasional mild pain. [Filing No. 90-4 at 158.] Dr. McGuirk noted that Mr. Fromer had "very good results at this stage following his procedures. He can use his right hand and index finger without any specific restrictions. His swelling will continue to improve over time. He was counseled he may continue to have some pain in his right hand secondary to his prior injuries as well as prior surgeries about his right hand." [Filing No. 90-4 at 160.]

C. **Discussion**

Mr. Fromer alleges that Nurse Riggs was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment when she ignored his back, knee, and hand pain. Nurse Riggs has moved for summary judgment on the Eighth Amendment claims against her, and the Court addresses her arguments below. Before discussing Mr. Fromer's various conditions, the Court sets forth the applicable law.

*1. Applicable Law*

At all times relevant to Mr. Fromer's claims, he was a convicted inmate. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment"). Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment

deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered

from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's

condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman

ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

An objectively serious medical need is "one that has been diagnosed by a physician as

mandating treatment or one that is so obvious that even a lay person would perceive the need for

a doctor's attention." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (internal quotations and

citations omitted). A medical condition that causes pain can be serious without being life-

threatening, *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011); *Lewis v. McLean*, 864 F.3d 556,

563 (7th Cir. 2017) (finding muscle spasms and accompanying back pain objectively serious), but

"this is not to say, however, that every ache and pain or medically recognized condition involving

some discomfort can support an Eighth Amendment claim," *Gutierrez v. Peters*, 111 F.3d 1364,

1372 (7th Cir. 1997). As the Seventh Circuit has explained:

> Deliberately [] ignor[ing] a request for medical assistance has long been held to be
> a form of cruel and unusual punishment, but this is provided that the illness or injury
> for which assistance is sought is sufficiently serious or painful to make the refusal
> of assistance uncivilized. A prison's medical staff that refuses to dispense bromides
> for the sniffles or minor aches and pains or a tiny scratch or a mild headache or
> minor fatigue--the sorts of ailments for which many people who are not in prison
> do not seek medical attention--does not by its refusal violate the Constitution. The
> Constitution is not a charter of protection for hypochondriacs. But the fact that a
> condition does not produce "objective" symptoms does not entitle the medical staff
> to ignore it. … Pain, fatigue, and other subjective, nonverifiable complaints are in
> some cases the only symptoms of a serious medical condition.

*Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996) (internal citations omitted). Even if an injury

may later turn out to not be serious, if the injuries *appear* to be serious, prompt medical attention

must be provided. *Davis v. Jones*, 936 F.2d 971, 972 (7th Cir. 1991).

Something more than negligence or even malpractice is required to succeed on an Eighth Amendment deliberate indifference claim. *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013)). "Even objective recklessness – failing to act in the face of an unjustifiably high risk that is so obvious that it should be known – is insufficient to make out a claim." *Id.* (citing *Farmer*, 511 U.S. at 836-38). "[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Freeman*, 394 F.3d 469, 478 (7th Cir. 2005) (internal citations and quotations omitted).

"To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see Plummer v. Wexford Health Sources, Inc.*, 609 Fed. App'x. 861, 862 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). "Under the Eighth Amendment, [a plaintiff] is not entitled to demand specific care. [He] is not entitled to the best care possible. [He] is entitled to reasonable measures to meet a substantial risk of serious harm to [him]." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). "A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of

treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* (internal citation omitted). However, "[a] jury can infer conscious disregard of a risk from a defendant's decision to ignore instructions from a specialist." *Zaya v. Sood*, 836 F.3d 800, 806 (7th Cir. 2016). Even a few days' delay in addressing a severely painful but readily treatable condition may constitute deliberate indifference. *Smith v. Knox County Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012). A prisoner need not show that he was "literally ignored" to establish deliberate indifference. *Arnett*, 658 F.3d at 751.

####### 2. *Analysis*

Nurse Riggs argues that she is entitled to summary judgment because she is a registered nurse and is unable to prescribe medication. [Filing No. 91 at 24.] She asserts that providing Mr. Fromer with accurate information regarding his x-rays and the fact that a doctor would not prescribe pain medication based on normal x-rays cannot be considered deliberate indifference. [Filing No. 91 at 24.] As to Nurse Riggs' responses to Mr. Fromer's RFHCs regarding not receiving pain medication after his Tegretol was discontinued, Nurse Riggs argues that there was an approval process for the medications that had been ordered, and that the orders had been submitted for approval. [Filing No. 91 at 24.] She contends that "[t]here is nothing in the record suggesting that she knew [Mr. Fromer's] prescribed medications were ineffective, and she reasonably relied on the judgment of the doctors." [Filing No. 91 at 25.]

In his response, Declaration, "Evidence Declaration," and Statement of Material Facts in Dispute, Mr. Fromer focuses mainly on Dr. Chavez's treatment but also argues that Nurse Riggs acted with deliberate indifference when she: (1) gave him a "strange reply" to his request for a hand brace on January 30, 2017, and said that the issue had been addressed when it had not; (2) did not promptly respond to RFHCs filed in July 2016 related to not receiving pain medication

after his Tegretol had been discontinued; (3) instructed Mr. Fromer to continue taking Tegretol at a May 20, 2016 visit despite his complaints of side effects, and refused to refer him to a doctor at that visit; and (4) did not refer him to a doctor in February 2017 for hand pain. [Filing No. 150; Filing No. 151; Filing No. 152; Filing No. 153.]

In reply, Nurse Riggs argues that to the extent Mr. Fromer argues she was deliberately indifferent by providing him with knee sleeves that did not fit, he has not provided any evidence that she was involved in the ordering process or deliberately ordered sleeves that did not fit. [Filing No. 164 at 2.] Nurse Riggs argues that Mr. Fromer did not allege in his Complaint that she intercepted RFHCs he submitted in January and February 2017. [Filing No. 164 at 3.] She also contends that she cannot prescribe or order medications, but that she ensured that Mr. Fromer would see a doctor in response to his July 2016 RFHCs, so her response was not deliberately indifferent. [Filing No. 164 at 3.] Nurse Riggs argues that Mr. Fromer has not presented any evidence that she had a duty to refer him to a doctor after having normal x-rays, or that it was improper for her to rely on the normal x-rays. [Filing No. 164 at 5-6.] Regarding Mr. Fromer's complaints of side effects from Tegretol during his May 20, 2016 visit, Nurse Riggs argues that she did not observe him having side effects, that she did not have the authority to instruct him to discontinue a medication, and that if she had observed side effects she would have referred him to a doctor. [Filing No. 164 at 7-8.]

Mr. Fromer's claims are based on back pain, knee pain, and hand pain. Nurse Riggs acknowledges that Mr. Fromer's hand pain is an objectively serious medical need, and that "there is likely an issue of fact regarding whether [Mr. Fromer's] back and knee pain constitute objectively serious medical needs." [Filing No. 164 at 2.] Accordingly, she assumes for purposes of summary judgment that Mr. Fromer's back and knee pain are objectively serious medical needs,

along with his hand pain.  [Filing No. 164 at 2.]  Consequently, the Court assumes the same and

will move to the second part of the deliberate indifference analysis – whether Nurse Riggs knew

about Mr. Fromer's conditions and the substantial risk of harm they posed, but disregarded that

risk.  *Farmer*, 511 U.S. at 834.  In doing so, the Court separately considers Nurse Riggs'

involvement in the care of each of Mr. Fromer's conditions.[9]

### a.  Back Pain

Nurse Riggs was involved with Mr. Fromer's care for complaints of back pain on four

occasions:

- On February 4, 2016, Nurse Riggs reviewed back x-rays with Mr. Fromer and informed him that they showed mild degeneration.  [Filing No. 90-4 at 28.]  She informed Mr. Fromer that because the x-rays were normal, the doctor would not be prescribing pain medication.  [Filing No. 90-4 at 28.]

- On June 23, 2016, Nurse Riggs wrote in the response section of Mr. Fromer's June 23, 2016 RFHC relating to being taken off Tegretol and not receiving another pain medication "Scheduled for MD 6/29/16."  [Filing No. 90-4 at 58.]

- In July 2016, Nurse Riggs received three RFHCs in which Mr. Fromer complained that he was in pain, his Tegretol had been stopped, and he had not received a different pain medication.  [Filing No. 90-4 at 60-61; Filing No. 139 at 19.]  When Nurse Riggs received the RFHCs, she investigated his complaints by reviewing the medical records to find out if he had a valid prescription for other medications.  [Filing No. 90-5 at 4.]  Nurse Riggs ultimately notified Dr. Chavez that Dr. Chavez's orders of Naproxen and Tylenol had not been approved or denied, Dr. Chavez resubmitted her requests, and Mr. Fromer received the Naproxen and Tylenol on July 25, 2016.  [Filing No. 90-3 at 9; Filing No. 90-5 at 4; Filing No. 90-4 at 65-66.]

- On November 15, 2016, Nurse Riggs saw Mr. Fromer due to complaints of back pain, among other complaints.  [Filing No. 90-4 at 90.]  Nurse Riggs observed Mr. Fromer walking into the infirmary without difficult and noted that he looked to be in no pain.  [Filing No. 90-4 at 91.]  Nurse Riggs referred Mr. Fromer to a doctor for pain management, and he was eventually prescribed

---

[9] It is unclear from the record evidence whether some of the encounters between Mr. Fromer and Nurse Riggs related to general pain or specifically to back, knee, or hand pain.  The Court assumes that, when not specified, Mr. Fromer was complaining regarding all three conditions, and considers the encounter in connection with each condition.

Tylenol, Neurontin, and Naprosyn for pain. [Filing No. 90-4 at 81; Filing No. 90-4 at 93.][10]

A reasonable finder of fact could not conclude that these four encounters indicate that Nurse Riggs was deliberately indifferent to Mr. Fromer's back pain. First, Nurse Riggs explained to Mr. Fromer on February 4, 2016 that his back x-rays (which had already been reviewed by a doctor) were normal and that a doctor would not prescribe pain medication based on normal x-rays. Mr. Fromer has not presented any evidence, nor has he even argued, that either of those statements were false. And Nurse Riggs was not authorized to prescribe pain medication herself. Mr. Fromer's claim that Nurse Riggs' failure to refer him to a doctor after his x-rays were normal constituted deliberate indifference is without merit. *See Forbes*, 112 F.3d at 267 (an inmate "is not entitled to demand specific care," nor is he "entitled to the best care").

Second, Nurse Riggs' response to Mr. Fromer's June 23, 2016 RFHC in which she noted that he was scheduled for a doctor visit a few days later cannot constitute deliberate indifference. Mr. Fromer was requesting that he be prescribed a different type of pain medication since he was no longer taking Tegretol, and Nurse Riggs could not prescribe medication. Instead, she scheduled him for a doctor visit.

Third, although Mr. Fromer argues that Nurse Riggs did not promptly respond to his July 11, 2016 RFHC until July 21, 2016, he has not provided any evidence that the delay in receiving pain medication after his Tegretol was discontinued was due to any actions of Nurse Riggs. And even if it was, Mr. Fromer has not presented any evidence that Nurse Riggs acted anything other

---

[10] Nurse Riggs also saw Mr. Fromer on March 4, 2016 for an infection on his face. [Filing No. 90-4 at 32-33.] Mr. Fromer argues that the records from this visit are inadmissible. [Filing No. 153 at 7.] Because this encounter did not relate to Mr. Fromer's back, knee, or hand pain, which are the only conditions for which he alleges claims in his Complaint, [Filing No. 2], the Court need not consider Nurse Riggs' treatment of Mr. Fromer during the March 4, 2016 visit. Similarly, records from January 26 and January 29, 2017 visits with Nurse Riggs for open sores on Mr. Fromer's face, [Filing No. 164-2 at 1-4], are not relevant to the claims he brings in this litigation.

than negligently to the extent she ignored his July 21, 2016 RFHC.  *See King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) ("Negligence – even gross negligence – is insufficient to [show deliberate indifference]").  Indeed, Nurse Riggs appears to have been the first person to discover, through her investigation of Mr. Fromer's July 2016 RFHCs, that Dr. Chavez's orders for pain medication had neither been approved nor denied and that Mr. Fromer had not received the medication.  Shortly after her discovery, Mr. Fromer received the medication.

Finally, although Nurse Riggs noted that Mr. Fromer did not appear to be in pain when she saw him at the November 15, 2016 visit, she still referred him to a doctor for pain management. Referral to an appropriate medical professional simply cannot equate to deliberate indifference.

Because Nurse Riggs did not act deliberately indifferently to Mr. Fromer's back pain, her Motion for Summary Judgment as to Mr. Fromer's claims related to his medical condition of back pain is **GRANTED**.

### b.  Knee Pain

Nurse Riggs and Mr. Fromer had six encounters relating to his knee pain:

- On February 4, 2016, Mr. Fromer saw Nurse Riggs complaining of knee pain. [Filing No. 90-4 at 28.]  Mr. Fromer informed Nurse Riggs that prior to incarceration he was told by a doctor that he needed a total knee replacement. [Filing No. 90-4 at 28.]  Nurse Riggs reviewed the knee x-rays with Mr. Fromer and informed him that they were normal and that the doctor would not be prescribing pain medication based on a normal x-ray.  [Filing No. 90-4 at 28.]

- On March 22, 2016, Nurse Riggs noted in response to a RFHC submitted by Mr. Fromer in which he complained of knee pain that a knee brace had been issued.  [Filing No. 90-4 at 37-40.]

- On May 20, 2016, Nurse Riggs saw Mr. Fromer and he thanked her for his new knee sleeve and said his knee felt much better.  [Filing No. 90-4 at 53.]  She noted that there were no signs of pain, no grimacing, and that Mr. Fromer was walking without difficulty.  [Filing No. 90-4 at 53.]

- On June 23, 2016, Nurse Riggs wrote in the response section of Mr. Fromer's June 23, 2016 RFHC relating to being taken off Tegretol and not receiving another pain medication "Scheduled for MD 6/29/16." [Filing No. 90-4 at 58.]

- In July 2016, Nurse Riggs received three RFHCs in which Mr. Fromer complained that he was in pain, his Tegretol had been stopped, and he had not received a different pain medication. [Filing No. 90-4 at 60-61; Filing No. 139 at 19.] When Nurse Riggs received the RFHCs, she investigated his complaints by reviewing the medical records to find out if he had a valid prescription for other medications. [Filing No. 90-5 at 4.] Nurse Riggs ultimately notified Dr. Chavez that Dr. Chavez's orders of Naproxen and Tylenol had not been approved or denied, Dr. Chavez resubmitted her requests, and Mr. Fromer received the Naproxen and Tylenol on July 25, 2016. [Filing No. 90-3 at 9; Filing No. 90-5 at 4; Filing No. 90-4 at 65-66.]

- On November 15, 2016, Nurse Riggs saw Mr. Fromer due to complaints of knee pain, among other complaints. [Filing No. 90-4 at 90.] Nurse Riggs observed Mr. Fromer walking into the infirmary without difficult and noted that he looked to be in no pain. [Filing No. 90-4 at 91.] Nurse Riggs referred Mr. Fromer to a doctor for pain management, and he was eventually prescribed Tylenol, Neurontin, and Naprosyn for pain. [Filing No. 90-4 at 81; Filing No. 90-4 at 93.]

As with his back pain, a reasonable finder of fact could not conclude that Nurse Riggs was deliberately indifferent to Mr. Fromer's knee pain. First, at the February 4, 2016 visit, Nurse Riggs explained that Mr. Fromer's knee x-ray was normal, and that a doctor would not prescribe pain medication based on a normal x-ray – both statements that are supported by the record evidence. Her interactions with Mr. Fromer at the February 4, 2016 visit do not support a deliberate indifference claim.

Second and third, the March and May 2016 encounters show that Nurse Riggs responded to Mr. Fromer's complaint of knee pain and his request for a knee sleeve by doing just what Mr. Fromer requested – ordering a knee sleeve – and that Mr. Fromer thanked Nurse Riggs for doing so and stated that his knee felt better.

Fourth, Nurse Riggs' response to Mr. Fromer's June 23, 2016 RFHC was appropriate, as he was requesting additional pain medication which Nurse Riggs could not prescribe. Instead, she scheduled an appointment with a doctor for him.

Fifth, as discussed above in connection with Mr. Fromer's back pain, there is no evidence that Nurse Riggs somehow ignored or mishandled Mr. Fromer's July 2016 RFHCs complaining that he had not received pain medication after his Tegretol was discontinued. Nurse Riggs investigated, determined that Dr. Chavez's prescription orders had not been filled, Dr. Chavez resubmitted the requests, and Mr. Fromer received his medication.

Finally, although Nurse Riggs observed that Mr. Fromer did not appear to be in pain and was walking normally on November 15, 2016, she still referred him to a doctor for pain management.

These encounters simply would not allow a reasonable finder of fact to conclude that Nurse Riggs was deliberately indifferent to Mr. Fromer's knee pain, and Nurse Riggs' Motion for Summary Judgment as to his claims related to his knee pain is **GRANTED**.

### c. **Hand Pain**

Nurse Riggs and Mr. Fromer had four encounters regarding his chronic hand pain:

- On June 23, 2016, Nurse Riggs wrote in the response section of Mr. Fromer's June 23, 2016 RFHC relating to being taken off Tegretol and not receiving another pain medication "Scheduled for MD 6/29/16." [Filing No. 90-4 at 58.]

- In July 2016, Nurse Riggs received three RFHCs in which Mr. Fromer complained that he was in pain, his Tegretol had been stopped, and he had not received a different pain medication. [Filing No. 90-4 at 60-61; Filing No. 139 at 19.] When Nurse Riggs received the RFHCs, she investigated his complaints by reviewing the medical records to find out if he had a valid prescription for other medications. [Filing No. 90-5 at 4.] Nurse Riggs ultimately notified Dr. Chavez that Dr. Chavez's orders of Naproxen and Tylenol had not been approved or denied, Dr. Chavez resubmitted her requests, and Mr. Fromer received the Naproxen and Tylenol on July 25, 2016. [Filing No. 90-3 at 9; Filing No. 90-5 at 4; Filing No. 90-4 at 65-66.]

- On November 15, 2016, Nurse Riggs saw Mr. Fromer due to complaints of hand pain, among other complaints. [Filing No. 90-4 at 90.] Nurse Riggs observed observed that Mr. Fromer's hand was tender and that he had pain with movement. [Filing No. 90-4 at 91.] She did not observe any swelling. [Filing No. 90-4 at 91.] Nurse Riggs referred Mr. Fromer to a doctor for pain management, and he was eventually prescribed Tylenol, Neurontin, and Naprosyn for pain. [Filing No. 90-4 at 81; Filing No. 90-4 at 93.]

- On December 15, 2016, Nurse Riggs saw Mr. Fromer regarding an RFHC he had submitted requesting a wrist brace. [Filing No. 90-4 at 97.] When Nurse Riggs attempted to question Mr. Fromer about his hand and his injury, he was argumentative and threatened to sue her. [Filing No. 90-4 at 97.] The visit ended with Nurse Riggs asking Mr. Fromer to leave. [Filing No. 90-4 at 97.]

First and second, as with his complaints of back and knee pain, Nurse Riggs' handling of the June 23, 2016 and July 2016 RFHCs does not support a claim of deliberate indifference. Third, while Nurse Riggs did observe that Mr. Fromer's hand was tender and appeared to be painful at the November 15, 2016 visit, she referred him to a doctor for pain management. Finally, the evidence indicates that Nurse Riggs attempted to help Mr. Fromer at the December 15, 2016 visit regarding his request for a wrist brace by asking him about his hand and his injury, but that the visit was terminated because she found Mr. Fromer to be argumentative.[11]

No reasonable finder of fact could conclude that Nurse Riggs was deliberately indifferent to Mr. Fromer's hand pain based on these three encounters, and Nurse Riggs' Motion for Summary Judgment as to Mr. Fromer's claims based on her treatment of his hand pain is **GRANTED**.[12]

---

[11] Mr. Fromer's statement that he told Nurse Riggs that she "may understand better where the injury was exactly by looking at my records," [Filing No. 151 at 9], does not contradict Nurse Riggs' notes from the visit stating that Mr. Fromer was argumentative when she asked him questions about his hand and his injury and he stated "you have my medical record in front of you, you just need to read it," [Filing No. 90-4 at 97].

[12] Mr. Fromer refers to October 12, 2016, January 30, 2017, February 2, 2017, February 11, 2017, February 14, 2017, and March 4, 2017 encounters with Nurse Riggs, but has not produced any records from those encounters. [See Filing No. 150 at 7; Filing No. 151 at 7; Filing No. 151 at 12-13.] In any event, his characterizations of those encounters do not bolster his deliberate indifference claim against Nurse Riggs. [See, e.g., Filing No. 150 at 7 (Mr. Fromer stating that

# IV.
## CONCLUSION

"To infer deliberate indifference on the basis of a [medical professional's] treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet*, 439 F.3d at 396. There is no evidence that Nurse Riggs acted with deliberate indifference to Mr. Fromer's back, knee, or hand pain. Accordingly, as set forth above, Nurse Riggs' Motion for Summary Judgment, [90], is **GRANTED** and the Clerk is **DIRECTED** to terminate Nurse Riggs as a party to this lawsuit. No partial final judgment shall enter, however. Further, Mr. Fromer's Motion to Exclude the Medical Defendants['] Expert Report, [93], is **DENIED** without prejudice to re-file it in advance of trial, and his Motion for Confirmation, [140], is **GRANTED** as set forth above.

Mr. Fromer's deliberate indifference claims against Dr. Chavez remain for trial. The Court requests that the Magistrate Judge confer with Mr. Fromer and Dr. Chavez to address the possibility of resolving the remaining claims short of trial.


Date: 3/29/2019

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

---

Nurse Riggs told him on January 30, 2017 in response to his request for a knee brace that a brace with metal supports would not be allowed and that Nurse Riggs stated that the knee brace request had been addressed on February 2, 2017 when it had not); Filing No. 151 at 7 (Mr. Fromer stating that he saw Nurse Riggs on October 12, 2016 and that she told him Naproxen had been ordered but that there was "no record of Neurontin"); Filing No. 151 at 12-13 (Mr. Fromer stating that Nurse Riggs recorded his February 11, 2017 visit as a "refusal," and that she recorded his February 14, 2017 visit as a "refusal" because he was a half hour late).] Additionally, to the extent Nurse Riggs and Mr. Fromer interacted on March 4, 2017, it was related to him "expelling large amounts of blood" and to Nurse Riggs recording him as refusing a visit for that condition, and not to the back, knee, and hand pain that are the subject of this lawsuit.

**Distribution to:**

Louis P. Fromer
#241520
Indiana State Prison
Electronic Service
Participant - Court Only


**Distribution via ECF only to all counsel of record**